IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>    Plaintiff,<br><br><br><br>vs.<br><br><br><br>FRANCES M. FLOOD and SUSIE STROHM<br><br>    Defendants. | MEMORANDUM DECISION AND ORDER.<br><br><br><br><br><br>Case No. 2:07-CR-00485-DB<br><br>Judge Dee Benson |

On February 2, 2009, this criminal trial commenced, with Defendant Frances M. Flood facing nine counts, including conspiracy (one count), false statements (three counts), securities fraud (two counts), and perjury (three counts), and Defendant Susie Strohm facing eight counts, which included the same counts as Defendant Flood regarding conspiracy, false statements, and securities fraud, and two separate counts of perjury. Nearly one month later, on February 27, 2009, the jury convicted Defendant Flood of all nine counts. The jury acquitted Defendant Strohm of all counts against her except for one count of perjury. Both defendants moved at the close of the government's case and again following the jury verdict for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. In addition, both defendants

moved for a new trial pursuant to Rule 33. Additional briefing was provided by Defendant Strohm and the government on both motions pertaining to Defendant Strohm, and the Court held a hearing covering Defendant Strohm's motions on April 24, 2009. Defendant Strohm was represented by William B. Michael; the government was represented by D. Loren Washburn and Stewart C. Walz. At the hearing, the Court denied Defendant Strohm's Rule 33 motion and took her Rule 29 motion under advisement. Shortly thereafter, on May 15, 2009, the Court held a hearing covering Defendant Flood's motions. Defendant Flood was represented by Richard A. Van Wagoner and Samuel S. Harkness; the government was represented by D. Loren Washburn. The Court similarly denied Defendant Flood's Rule 33 motion and took her Rule 29 motion under advisement. After consideration of the briefs submitted by the parties and the oral arguments presented by counsel, the Court enters the following Memorandum Decision and Order.

## I. Background

The trial in this case lasted almost the entire month of February, 2009. This section does not recount in detail the entire universe of facts that were introduced by each side over the course of trial. Rather, it presents only the essential testimony and evidence, and does so in the light most favorable to the government, as is appropriate under Rule 29.

On January 31, 2008, a grand jury returned the Second Superseding Indictment ("Indictment") in this case that charged Defendants Frances M. Flood and Susie Strohm with offenses related to their management of ClearOne Communications, Inc. ("ClearOne"),[1] a

---

[1]  The company was called Gentner Communications until late 2001, when it changed its name to ClearOne Communications. The Court will refer to the company as Clear One

publicly traded company, between 2001 and 2003. Defendant Flood was the Chief Executive Officer and President of ClearOne from 1997 to 2003; Defendant Strohm was the Chief Financial Officer of ClearOne from 1997 through June, 2001, when she resigned the position of CFO and assumed the role of Controller. Defendant Strohm subsequently resumed the role of CFO in September, 2002.

Prior to June, 2001, ClearOne marketed its product line, which primarily consisted of audio and video conferencing equipment, through a network of manufacturing representatives and dealers, and recognized revenue every time it shipped relatively small quantities of product to these numerous customers. In June, 2001, ClearOne hired Timothy Morrison as its new Vice President of Sales and shortly thereafter adopted a distributor model in order to accelerate the recognition of revenue from product sales. Morrision was a full participant in the majority of the offenses charged in the indictment. He pled guilty to two misdemeanor counts of securities fraud in exchange for his full cooperation in the government's investigation of ClearOne. *See United States v. Morrison*, No. 2:07-CR-876 (D. Utah May 18, 2009).

Under the new distributor model, each distributor was responsible for a geographic territory within the United States and undertook to stock sufficient product to ship to the ClearOne dealers within their territory. In connection with this change, Flood, Strohm, and other ClearOne executives discussed with Ernst & Young, ClearOne's auditors, the method for properly recognizing revenue under the distribution model. Tracy Christman, one of Ernst & Young's auditors, advised Flood, Strohm, and others at ClearOne that to recognize sales to the

---

throughout, even when the legal name of the company might have been Gentner.

distributors as revenue at the time of shipment, three requirements must be met: (1) title must pass to the distributor; (2) the distributor must have no right to return the product to ClearOne; and, (3) the sales terms for the product must be fixed at the time of the shipment. Christman also advised the defendants that revenue could not be recognized if the buyer's obligation to pay for the products was contingent on sell-through to third parties.

In June, 2001, Flood attempted to recruit the first distributors for ClearOne. Flood and Morrison called two potential distributors, James Starin of Starin Marketing, and Mike Oltz, then of JB Anthony & Company. Flood told Starin and Oltz that if they became distributors of ClearOne, they would not have to pay for the product within the 90-day terms contained in a written distributor agreement, but would be allowed to delay payment for product until they sold it to third parties.

ClearOne's fiscal year begins July 1 and ends June 30. Prior to June 30, 2001, Starin accepted more than $800,000 worth of product from ClearOne with the understanding that he would not have to pay for the product until he sold it. Later that year, Oltz also became a ClearOne distributor and accepted quarter-end shipments from ClearOne in excess of the product he ordered or could sell. Oltz took these shipments on the condition that he could pay for them as he sold them. During this period, Strohm resigned her position as CFO of ClearOne. Strohm, however, continued to have primary responsibility for the preparation of ClearOne's financial statements and SEC filings and was the management point of contact for ClearOne's auditors and ultimately resumed the position of CFO in September, 2002.

During ClearOne's 2002 fiscal year, which ended June 30, 2002, additional companies signed distributor agreements with ClearOne and similarly accepted large shipments of products

at the end of ClearOne's quarters that they did not order and did not want because they received

promises that they would not have to pay for the products until they sold them to third parties.

The Defendants' motive for causing ClearOne to enter into these transactions was to meet the

revenue projections the Defendants gave to financial analysts who followed ClearOne's stock

price. ClearOne had met its earnings per share ("EPS") projections for approximately four

straight years and Flood was determined that ClearOne would meet its projections in fiscal years

2001 and 2002.

  The pressure to hit ClearOne's revenue projections escalated through fiscal year 2002. In

order to reach their projections, the Defendants caused the distributors to take product they did

not order and did not want. In June of 2002, the last month of the fiscal year, ClearOne was still

significantly short of its revenue projections. To prevent the anticipated revenue shortfall, Flood,

Strohm, and Morrison caused ClearOne to again make large shipments to distributors. For

example, during this period, Oltz placed an order for only $200,000 worth of products but

received a shipment worth five times that amount.

  Despite making such shipments, ClearOne was still not close to meeting its revenue

projections as the end of the fiscal year neared. As a result, Flood, Strohm, and Morrison became

increasingly desperate in their search for companies to take their products, one of which–a video

conferencing unit dubbed the V-There–had experienced a number of operational difficulties. As

of late June, 2002, ClearOne had manufactured more V-There products than it could sell to its

distributors and dealers. The inability to sell the V-Theres made it difficult or impossible for

ClearOne to meet the sales numbers it projected to analysts for the end of the fiscal year.

  In one effort to escape this predicament, Morrison, with Flood's concurrence, contacted a

former business associate, Scott Wysota, who was an executive recruiter in the steel industry and the owner of SAW Associates. Wysota had no prior experience with ClearOne or videoconferencing or teleconferencing equipment. Morrison called Wysota to persuade him to accept a shipment of V-There units. Shortly thereafter, Wysota traveled to Salt Lake City to become acquainted with the V-There product. At the time, Flood encouraged Wysota to use his wife's contacts in the New York legal market to try to sell the V-There units, but also promised that if Wysota accepted a shipment of these units from ClearOne, that a ClearOne sales team would sell the products. As a result of his conversations with Flood and Morrison, Wysota agreed to accept a shipment of V-There units. ClearOne subsequently shipped 100 V-There units to Wysota at a total price of $500,000. The units languished in Wysota's garage at his home until they were returned to ClearOne after the SEC investigation began. Wysota never signed a written agreement with ClearOne or sold a single V-There unit.

On June 20, 2002, Flood sent an email message to Mike Peirce, a ClearOne board member, proposing that he purchase V-There units. Strohm was copied on this email. The email was captioned: "Need your help desperately!!!!" and read:

> I received your email today and feel the need to talk live regarding our current
> situation–we are in a dire straight. At this point, we've talked to every dealer
> (ours and videolabs) regarding Vthere. While we've seen some interest, it is not
> to the level we need to make this quarter–hence–we need your help.
> Understanding that you cannot send a check straightaway–we can cut terms for 90
> days so that next quarter you can move and pay as you go–but I must ship the
> PAL codecs today for the revenue----
> We have every intention to conduct a full attack on the telco channel and
> anywhere else we can move the product–but without your assistance–things will
> be exceptionally bleak . . .
> Please give me a call so we can strategize . . . regards, Fran

When Peirce failed to order the V-Theres, Flood sent an email to Colin Stevenson, of

Production Audio Sales ("PAS"), an Australian company, requesting his assistance. That email

read, in relevant part:

> Now for the favor part. We over built our Vthere products which will ultimately
> impact our numbers for the quarter. Tim Morrison has an idea which can help us
> and Production at the same time. I am asking him to call you tomorrow morning
> (our time) to discuss the details–I'd appreciate your help–talk with you soon. Best
> regards, Fran

Eventually, after talking to Morrison, Stevenson agreed to issue a blank purchase order to

ClearOne for the purchase of products and the order was processed by employees of ClearOne.

On Saturday, June 29, 2002, Flood, Strohm, and Morrison met at the ClearOne offices to

develop a plan for shipping additional products in order to meet ClearOne's revenue goals before

the fiscal year ended on June 30, 2002, the following day. Flood and Strohm calculated the

amount and purchase price of the products that needed to be sold to each distributor, to Wysota,

and to Stevenson, among others, in order to meet ClearOne's projections. For example, during

the June 29th meeting, Flood, Strohm, and Morrison decided that PAS would be shipped

approximately $1.1 million worth of ClearOne products. Though the blank purchase order PAS

had issued listed the price of the V-Theres at approximately $3300 per unit, Strohm increased the

price of the V-Theres ultimately shipped to PAS to $5,000 per unit in order to raise the overall

profit and allow ClearOne to reach its projected revenue goals. Lynne Ringwood, who was

ClearOne's point of contact for PAS, testified that the price of the V-There changed between

Friday, June 28th, when she prepared a pro forma invoice, and Monday, July 1st, when she

received the actual shipping documents. As an additional example, during the June 29th meeting,

Flood, Strohm, and Morrison decided to ship approximately $1.8 million worth of ClearOne products to MCSi of Dayton, Ohio, a ClearOne customer, although not a distributor. ClearOne shipped this product without receiving a purchase order from MCSi. Instead, on July 1st, Flood, who had a longstanding relationship with the president of MCSi, Mike Peppl, sent Peppl an email saying, "here is the purchase order for the products that you purchased," and attached a list of the products.

Shortly after the end of the 2002 fiscal year, Judy Meyers, ClearOne's accounts receivables manager, asked Strohm why ClearOne shipped such an unusually large amount of product to PAS. Strohm answered that ClearOne shipped the large amount of product because PAS ordered the product to expand its market. This, however, was not the case. Stevenson, in his statement to the Australian Police, said that he had not ordered the V-Theres which were shipped to him at the end of June. Nor had he anticipated receiving the volume of product that was shipped to him at the end of ClearOne's fiscal year (which in fact represented more that five times the anticipated amount). Moreover, Stevenson was not told by anyone at ClearOne that he would be charged the increased price of $5000 per V-There, which Strohm had calculated to help ClearOne reach its sales numbers.

William Olpin, another ClearOne employee, also received a suspicious answer from Strohm when he asked about the end of year sales. Olpin testified that in May or early June of 2002 he met with Flood and told her that ClearOne would not be able to manufacture sufficient product to meet the sales projections. Nonetheless, ClearOne met its year-end goals. When Olpin asked Strohm how ClearOne met its goals, Strohm told Olpin that he should not worry about it. This answer worried Olpin sufficiently that he left the company shortly thereafter.

On August 13, 2002, Flood participated in a telephone call with stock analysts. During this call, Flood and others discussed ClearOne's EPS projections for the first quarter of ClearOne's 2003 fiscal year. Flood asked Scott Newth, a new employee of ClearOne, to present the earnings projections for the next quarter. Newth presented the figures during the analyst call, but then undertook his own research to answer follow-up questions from analysts. Based upon his review of the numbers, Newth concluded that the revenue projections he had given during the analyst call were significantly overstated. Specifically, he concluded that, at best, ClearOne would earn one penny per share, but more likely would lose money. By contrast, the projections given during the analyst call, at Flood's direction, were that ClearOne would earn between eighteen and twenty-three cents a share. Newth discussed his findings with Strohm and Morrison, both of whom confirmed that his numbers were accurate. Strohm and Newth then met with Flood so that Newth could express his opinion that the EPS projections given to the analysts should be restated. Flood was not willing to restate the numbers and she and Strohm began considering various untrue excuses that they could present as the reason they did not make their projected revenue. Newth was sufficiently concerned about the Defendants' refusal to restate the numbers that he resigned from ClearOne on August 26, 2002.

Brain Woodland, a cost accountant at ClearOne, subsequently became aware that PAS, the Australian company, had in effect taken the products as an accommodation to ClearOne and that PAS wanted to return the products to ClearOne. In October, 2002, Woodland met with Strohm and expressed concern that PAS wanted to return over $1,000,000 worth of inventory and ClearOne did not want to show this inventory as a return on its books. In December, 2002, Woodland again met with Strohm to express his concerns about the PAS return. At that time,

Strohm recounted for him the history of the PAS transaction. According to Woodland, Strohm told him that PAS accepted the shipment of V-Theres because Mike Peirce failed to place an order for the V-Theres. Strohm also told Woodland that PAS had not removed the V-Theres from the bonded warehouse in Australia because removing the product would require PAS to pay duties. Woodland told Strohm that PAS's request to return the product could require ClearOne to restate its 2002 financial statements. Strohm, however, did not want to restate the 2002 financials, claiming instead that the products belonged to PAS. Strohm also told Woodland that she hoped the issue would resolve itself because she did not want to deal with the auditors on the issue. Woodland did not know how the return of product was ultimately handled because, shortly after his meeting with Strohm in December, he gave notice of his intention to resign from ClearOne. This last conversation between Strohm and Woodland regarding the PAS transaction took place after Strohm and other ClearOne executives became aware that Morrison had spoken with SEC officials, and approximately sixty-five days before Strohm gave the testimony for which she was convicted.

Finally, on October 8, 2002, Flood sent Morrison a document entitled "Last and Final Move on the Chessboard." In that document, Flood wrote that ClearOne switched to the Distribution model "to push product out there for today revenue." In assessing her company's predicament, Flood stated:

> In summary–we got ourselves on heroin–and addicted our manufacturers reps too.
> Bottom line–we all need to go COLD TURKEY.
> The reality is–we need revenue and we need some growth. It is not going to come
> from doing the same bullshit we've done in the last five quarters. And we on [sic]
> a collision course if we don't get off the train we're on and focus on the realities.

A falling out between Flood and Morrison ensued which ultimately led Morrison to approach the SEC regarding potential violations at ClearOne, and in January, 2003, the SEC filed an enforcement action against ClearOne, Flood, and Strohm alleging violations of various securities laws. *See SEC v. ClearOne Communications, Inc., et al.*, 2:03-CV-00055-DAK (D.Utah Feb. 19, 2004) (the "SEC Action"). Final judgment in the SEC Action was entered against Flood and Strohm on February 19, 2004. Several years later, on July 25, 2007, the government charged Flood and Strohm in a multi-count indictment in the present case.

As noted above, a grand jury returned a second superceding indictment in this case on January 31, 2008, charging both Strohm and Flood with a variety of crimes. Count I of the Indictment charged the Defendants with a conspiracy in violation of 18 U.S.C. § 371. The government sought to prove that object of the Defendants' conspiracy was to ship ClearOne products to distributors and others on payment terms that were not disclosed to ClearOne's auditors, in order to ensure that ClearOne would meet its revenue projections, and consequently buoy its stock price. The Indictment alleged that the Defendants conspired to: (1) falsify books, records, and accounts of ClearOne; (2) fake false statements in quarterly and annual reports; (3) make and caused to be made false and misleading statements to an accountant in connection with the accountant's audits of ClearOne for the fiscal years ending June 30, 2001, and June 30, 2002; and (4) commit securities fraud.

The essence of the conspiracy the government sought to prove at trial was that the Defendants and their coconspirator Morrison agreed to ship ClearOne's products to ClearOne's distributors on undisclosed payment terms, while representing to Ernst & Young, ClearOne's auditors, that the payment terms in written distributor agreements were the complete agreement

with the distributors. The primary undisclosed payment term was that the Defendants promised the distributors that they would not have to pay for large shipments of ClearOne products sent to them at the end of ClearOne's fiscal quarters until the distributors sold the products to third parties. In addition, the government's case attempted to show that the Defendants, and Morrison, conspired to ship products to others who were not distributors in order to fraudulently recognize revenue on product ClearOne could not otherwise sell prior to the end of the fiscal year.

Counts II through IV charged the Defendants with making material false representations to Ernst & Young in relation to its audit of ClearOne's year-end financial statement for 2002 and its review of ClearOne's 2003 first-quarter financial statement. The Defendants represented to their auditors that: (1) they had disclosed all sales terms; (2) the shipments made by ClearOne on June 29, 2002 were requested by their customers on valid purchase orders; (3) all contracts and agreements were disclosed; and (4) ClearOne's accounts receivables were valid claims. The government's theory was that these representations were false because the Defendants promised the distributors that: (1) they did not have to pay for quarter-end shipments until the distributors sold these products to third parties; (2) these promises were not disclosed to the auditors; (3) the shipment of these products to the distributors were not genuine sales; and (4) some of the shipments on June 29 and 30, 2002 were not made at the request of the distributors or on valid purchase orders.

Counts V and VI of the Indictment charged securities fraud with respect to two transactions which occurred on June 29 and 30, 2002. The government's position was that the Defendants recorded these transactions as sales shipments, even though the entities did not purchase said products but instead took the shipments as a favor to ClearOne in order to help

ClearOne meet revenue and EPS projections. Specifically, Count V alleged that the shipment of one hundred videoconferencing units to Wysota, at a total price of $500,000, was fraudulent in that the Defendants promised Wysota that he would not have to pay for the products until they were sold to third parties and that he could return the products to ClearOne if he or ClearOne was unable to sell them. Similarly, Count VI alleged that the shipment to PAS of $1.1 million of ClearOne product was fraudulent because in inducing PAS to accept these products ClearOne promised that PAS would not have to pay for the products until it sold the products to third parties and that PAS could return any products it could not sell.

Counts VII and VIII charge Strohm with perjury, and Counts IX, X, and XI charge Flood with perjury, in connection with their testimony during depositions and an evidentiary hearing in the SEC Action. Count VII charged Strohm with making false statements during a deposition in the SEC Action on February 19, 2003. Strohm gave the following testimony at the deposition in response to questions posed by Thomas M. Melton, the attorney representing the SEC:

> Q:    And do you know if Mr. Stevenson would have had to pay tariffs on the product had he taken possession of it?
> A:    I don't know.
> Q:    Do you know if he did pay tariffs on the product?
> A:    I don't know.

Count VIII of the Indictment charged that Strohm committed perjury during a preliminary injunction hearing held on March 4, 2003, in connection with the SEC Action. At the hearing, Strohm gave the following testimony in response to questions asked by her own lawyer:

> Q:    I now want to ask you some questions about the Production Audio. You are familiar with the SEC's allegations regarding the sale of ClearOne product to Production Audio in the end of 2001, fiscal 2001?

A:      Fiscal 2002.

Q:      I'm sorry. 2002. You're right and I'm wrong.

A:      Yes.

Q:      Were you involved in that sale?

A:      No.

Q:      When did it first come to your attention that ClearOne had sold product to Production Audio?

A:      I don't know.

Q:      Can you approximate it for us?

A:      I don't know if it would been [sic] before the end of the fiscal year or after the end of fiscal year.

Count IX and X charged Flood with perjury for statements she made at her deposition in

the SEC Action on February 20, 2003. At her deposition, Flood made the following declarations:

A:      The distributors were adhering to the revenue recognition policy.

Q:      That is there was a sale on fixed terms, no right of return, and title would pass?

A:      Yes, that's correct.

Q:      Is that true in every instance?

A:      Yes.

Q:      Did you ever learn that distributors ever understood that they had a different term of sale or term of purchase with ClearOne?

A:      Probably in mid December of 2002.

Q:      Is that the first time you learned that?

A:      That I heard of–I'd heard the language obviously, from Dave Francis actually, in mid December.

Q:      And that was the first time?

A:      It was news to me.

. . . .

Q:      At that time it appears that 1,800,000 in product was shipped on June 30th of 2002; is that correct?

A:      Yes, that's correct.

Q:      Did you participate in the sale of that product?

A:      What I had done was contact Mike Peppel after Chris Morrison–Chris Morrison began working with MCSI on that 1,864,355.50 in mid May, and had put together spreadsheets, had put together demo equipment and training, and he had been on pursuit with MCSI working directly with them from the midpoint of May forward. And my conversations with Mike Peppel would have been, Mike, our guys worked it out, they've worked out the details of what you need, what you want, etcetera, I want to get a go-ahead for the purchase order. So that would have

14

been the extent of my involvement. I wouldn't have known how much of the level of detail of what they got.

Finally, Count XI charged Flood with making false statements on March 4, 2003, during a hearing in the SEC Action. At the hearing, Flood gave the following testimony in response to questions asked by her own lawyer:

Q:    Were they using a distributor model at the time you elected to change that model?
A:    Yes.
Q:    Was that one reason why you thought you needed the change as well?
A:    Absolutely . . .
Q:    Did you change this model so you could recognize more revenue on the books of the company?
A:    No.
Q:    Was that ever discussed as a reason why you needed to change the model?
A:    No.

After several continuances, trial finally began on February 2, 2009. The government rested its case on February 20, 2009, after approximately three weeks of trial. As noted above, at the close of the government's case, both Flood and Strohm moved for a judgment of acquittal pursuant to Rule 29. The Court will now address each of the defendant's Rule 29 motions in turn.

## II. Standard of Review

In deciding a Rule 29 motion, the Court must view all evidence and draw all reasonable inferences in the light most favorable to the government to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Evans*, 318 F.3d 1011, 1018 (10th Cir. 2003) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). That is, the Court must "determine whether the evidence, if believed, would

establish each element of the crime." *Id.* at 1081 (citing *United States v. Vallo*, 238 F.3d 1242, 1246-47 (10th Cir. 2001)). The Court, however, does not consider "the credibility of witnesses and weigh[] the evidence as a thirteenth juror." *United States v. Ortiz-Ortiz*, 57 F.3d 892, 894 (10th Cir. 1995). Accordingly, the evidence necessary to support a verdict "need not conclusively exclude every other reasonable hypothesis and need not negate all possibilities except guilt." *United States v. Wilson*, 182 F.3d 737, 742 (10th Cir. 1999) (quoting *United States v. Parrish*, 925 F.2d 1293, 1297 (10th Cir. 1991)).

### III. Susie Strohm

#### A. Duplicity

Defendant Strohm first argues that Count VIII is duplicitous because it contains two allegedly false statements–first, that Strohm was not involved in the PAS sale, and second, that Strohm did not know when the PAS sale first came to her attention. The government concedes that the Count is duplicitous in that it charges two separate perjurious statements, but claims it was permissible to include both statements in the same count.

An indictment is duplicitous if it "charges the defendant with two or more separate offenses in the same count." *United States v. Trammell*, 133 F.3d 1343, 1354 (10th Cir. 1998) (citing *United States v. Haddock*, 956 F.2d 1534, 1546 (10th Cir. 1992)). An exception to this general rule exists where the several acts alleged in a single count "were all part of a single scheme." *United States v. Jaynes*, 75 F.3d 1493, 1502 (10th Cir. 1996); *see also United States v. Olmeda*, 461 F.3d 271, 281 (2d Cir. 2006) ("[A]cts that could be charged as separate counts of an indictment may instead be charged in a single count if those acts could be characterized as part of a single continuing scheme."); *United States v. Shorter*, 809 F.2d 54, 56 (D.C.Cir. 1987)

("[I]t is well established that two or more acts, each of which would constitute an offense standing alone and which therefore could be charged as separate counts of an indictment, may instead be charged in a single count if those acts could be characterized as part of a single, continuing scheme."). As a result, where the charges involve multiple acts that constitute a continuing course of conduct, the Government has some discretion whether to charge the defendant in a single count or in multiple counts.

There are no cases from the Tenth Circuit that directly address the propriety of including several acts of perjury in a single count. Cases from other federal circuits, however, demonstrate that it is often acceptable to charge a defendant with multiple false statements in one count. *See, e.g.*, *United States v. Berardi*, 629 F.2d 723, 729 (2d Cir. 1980) ("Although it is no doubt true that a single lie merits but a single punishment, it has long been accepted practice to charge perjury before the grand jury, committed in the course of the same appearance, in a one count indictment with each false declaration set forth in a particular specification." (citations omitted)); *United States v. Isaacs*, 493 F.2d 1124, 1155 (7th Cir. 1974) ("In perjury cases this means that where one offense is committed, all the false declarations pertaining to that offense can be charged in one count without making that count duplicitous."); *Vitello v. United* States, 425 F.2d 416, 419 (9th Cir. 1970) (noting the "well-settled law permitting the inclusion of several specifications of falsity in a single count of perjury and that proof of any one of such specifications is sufficient to support a verdict of guilty"); *United States v. Edmondson*, 410 F.2d 670, 673 n.6 (5th Cir. 1969) (same); *Arena v. United* States, 226 F.2d 227, 236 (9th Cir. 1955) (holding that several assignments of perjury "may be embraced in one count and that proof of the falsity of any one will sustain the count." (quoting 2 Wharton's Criminal Law § 1567, 1826

17

(12th ed., 1932))).

Despite the weight of this case law, there are nevertheless dangers associated with allowing the Government to proceed with a duplicitous perjury indictment. The Tenth Circuit has recognized three such dangers in other contexts: "(1) A jury may convict a defendant without unanimously agreeing on the same offense; (2) A defendant may be prejudiced in a subsequent double jeopardy defense; and (3) A court may have difficulty determining the admissibility of evidence." *United States v. Wiles*, 102 F.3d 1043, 1061 (10th Cir. 1996), *modified*, 106 F.3d 1516 (10th Cir. 1997), *judgment vacated on other grounds*, *United States v. Schleibaum*, 522 U.S. 945 (1997) (quoting *United States v. Sasser*, 971 F.2d 470, 477 n.5 (10th Cir. 1992))). The principal danger raised by the charge in the present case is that although the jury was in agreement that Strohm had committed perjury, it may not have been in unanimous agreement as to which of the two alleged perjuries contained in Count VIII constituted the crime of perjury.

The mere potential of such a lack of unanimity, however, does not necessarily warrant overturning an otherwise proper guilty verdict. First, an objection to a duplicitous indictment can be waived by the defendant if the objection is not raised prior to trial. *See, e.g.*, *United States v. Haber*, 251 F.3d 881, 888 (10 th Cir. 2001) ("In this circuit, a defendant's failure to 'timely challenge his indictment on duplicity grounds . . . waive[s] any later challenge based on a failure to use a special verdict form to avoid the alleged duplicity problem."); *Trammell*, 133 F.3d at 1355 ("[A] challenge to an indictment based on duplicity must be raised prior to trial. . . . Raising the objection at the close of the government's case is too late." (quoting *United States v. Hager*, 969 F.3d 883, 890 (10th Cir. 1992))). A late challenge to a duplicitous pleading is only permissible if "cause is shown that might justify the granting of relief from the waiver." *Haber*,

251 F.3d at 888; *Trammell*, 133 F.3d at 1355.

Second, the danger of non-unanimity in a duplicitous pleading may be cured by providing an appropriate unanimity instruction to the jury. The ideal cure for a duplicitous charge is "an augmented instruction requiring unanimity on one or the other of the acts charged within a count that otherwise appear to constitute separate offenses." *Trammell*, 133 F.3d at 1354-55. In the Tenth Circuit, however, a general unanimity instruction usually suffices to cure the risk of jury non-unanimity. *Wiles*, 102 F.3d at 1061 n.7 ("In this Circuit, as in most others, 'it is assumed that a general instruction on the requirement of unanimity suffices to instruct the jury that they must be unanimous on whatever specifications they find to be the predicate of the guilty verdict.'" (quoting *United States v. Phillips*, 869 F.2d 1361, 1366 (10th Cir. 1988))). Though the Tenth Circuit did not reach the issue in *Wiles*, it noted that "there are recognized exceptions to the rule that a general unanimity instruction is sufficient." *Id.*; *see, e.g.*, *United States v. Hiland*, 909 F.2d 114, 1140 n.44 (8th Cir. 1990) ("[A] specific unanimity instruction is required in cases where there is a genuine risk of jury confusion"); *United States v. Berros*, 833 F.2d 455 (3d Cir. 1987) (same); *United States v. Ryan*, 828 F.2d 1010, 1020 (3d Cir. 1987), *abrogated on other grounds*, *United States v. Wells*, 519 U.S. 482, 486 n.3 (1987) (finding that the general rule that a specific unanimity instruction is not required does not apply "in cases where the facts are exceptionally complex, or where the allegations in a single count are either contradictory or only marginally related to one another, or where there is a variance between the indictment and the proof at trial, or where there is a tangible indication of jury confusion") (citations omitted). Even though the *Wiles* court did not explicitly recognize these exceptions, it did engage in an evaluation of the risk of jury non-unanimity under the specific facts of the *Wiles*

case before ultimately holding that the general unanimity instruction given was sufficient. *Wiles*, 102 F.3d at 1061 n.7.

In the present case, Strohm argues that Count VIII was duplicitous in that it charged her with testifying falsely at a hearing in the SEC action about her lack of involvement in the PAS sale as well as about her knowledge about when the PAS sale came to her attention. Though each of these allegedly false statements might have supported a separate count of perjury, the statements are clearly related and both constituted part of what the government claimed at trial was Strohm's continuing effort to prevent her role in the PAS transaction from coming to light. Indeed, the only difference between the two statements is that one asks about Strohm's knowledge of the sale (did she know about the PAS sale before the close of the fiscal year?), and the other asks whether she was involved in it. The questions were also asked at the same hearing, one immediately following the other, by Strohm's own lawyer. Thus, they could hardly be more related. In addition, many courts have held that such statements made during the course of a single hearing may properly be charged in a single count. *See, e.g.*, *United States v. Berardi*, 629 F.2d at 729. As a result, charging the two statements in the same count was not improper.

In the alternative, even if this Court were inclined to believe that the indictment was improperly duplicitous, it would nevertheless reject Strohm's argument because it was both waived (by Strohm's failure to raise this objection in a timely fashion) and cured (through the Court's various unanimity instructions to the jury). Strohm's contention that Count VIII was duplicitous first surfaced in her memorandum in support of her motion for acquittal, which she filed on March 12, 2009, approximately two weeks after the close of trial. Memorandum in Support of Acquittal by S. Strohm, 4-5, dkt. 111 (Mar. 19, 2009). Strohm has not attempted to

justify her failure to raise this argument in a timely manner. Accordingly, under Tenth Circuit

case law, she has waived the right to object to the allegedly duplicitous nature of the indictment.

*See Haber*, 251 F.3d at 888; *Trammell*, 133 F.3d at 1355.

Furthermore, Strohm also failed to request a specific jury instruction that would have

cured the potential for jury non-unanimity in regards to the perjury charge. The proposed jury

instructions submitted to the Court by the defendants contain several references to the unanimity

requirement. Defendants' Proposed Jury Instructions, at 32, 38, dkt. 94 (Feb. 20, 2009).

Defendants' Proposed Instruction No. 31 requested the following unanimity language: "To reach

a verdict, whether it is guilty or not guilty, all of you must agree. Your verdict must be

unanimous on each count of the indictment. . . . The foreperson will write the unanimous answer

of the jury in the space provided for each count of the indictment, either guilty or not guilty. " *Id.*

at 38. The final instructions read to the jury contained similar language of equal force regarding

the unanimity requirement. Specifically, Jury Instruction No. 40 stated: "The verdict must

represent the considered judgment of each juror. In order to return a verdict, it is necessary that

each juror agree thereto. Your verdict must be unanimous." Jury Instructions, at 53, dkt. 108

(Feb. 27, 2009). Jury Instruction No. 41 similarly required the jury to reach "unanimous

agreement as to your verdict" before returning to the courtroom with a verdict. *Id.* at 54.

The defendants also requested specific unanimity instructions, but these only covered the

conspiracy charge, Count 1, of the indictment. Defendants' Proposed Jury Instructions, at 30-32.

The proposed language specifically referred to the overt act requirement ("Although you must

unanimously agree that the same overt act was committed, the United States is not required to

prove more than one of the listed overt acts."), and the underlying substantive offense ("In order

to return a guilty verdict, all twelve of you must agree upon the same listed acts, if any, that either of the defendants committed."). *Id.* The final instructions incorporated both of these proposals verbatim in Jury Instruction No. 20 and Jury Instruction No. 21. Jury Instructions, at 25, 26. Furthermore, Jury Instruction No. 1 also instructed the jury that they "are not to single out any one instruction alone as stating the law, but must consider the instructions as a whole." *Id.* at 2.

The final instructions read to the jury therefore contained several references to the unanimity requirement, both specific and general, and asked the jury to read all the instructions as a whole. As noted above, the assumption in the Tenth Circuit is that such instructions suffice to cure the potential for non-unanimity that follows an arguably duplicitous indictment. Furthermore, even the exceptions to this general rule developed in other circuits and alluded to by the Tenth Circuit in *Wiles* simply do not apply because the facts of this case demonstrate that there was no palpable risk of jury confusion.[2] In sum, even if the Court were to determine that

---

[2] For example, the facts of this case would most certainly fail to meet the four-part standard set out in *United States v. Ryan*, for determining whether a specific unanimity instruction is required. 828 F.2d at 1020. First, the facts relevant to Count VIII were not "exceptionally complex." Second, the two allegations in Count VIII were neither contradictory nor marginally related. The allegedly false statements were made at the same hearing about the same transaction–the PAS sale. Indeed, the question whether Strohm knew about the PAS transaction on the date it took place is an antecedent to the question whether Strohm was involved in the same transaction. Stated differently, there is little risk that a juror, having found that Strohm lied about being involved in a transaction that undisputedly occurred shortly before the end of ClearOne's 2002 fiscal year, would nevertheless find that she was telling the truth when she stated that she didn't know whether the transaction took place before or after the end of that fiscal year; or vise versa.  Third, there was no variance between the indictment and the proof at trial. Finally, there was no tangible indication of jury confusion. During the course of deliberating, the jury sent several communications to the Court, none of which dealt with unanimity problems.

the indictment was improperly duplicitous, Strohm's objection to the duplicitous nature of the indictment was waived because she did not make it in a timely fashion; did not seek a more specific unanimity jury instruction relating specifically to Count VIII; and, in any event, because the risk of jury non-unanimity was cured by the general unanimity instructions read to the jury, especially in light of the low risk of jury confusion under the facts of the present case.

### B. Sufficiency of the Evidence

The Court will next address whether the government presented sufficient evidence, under the Rule 29 standard articulated above, to convict Strohm of either of the allegedly false statements contained in Count VIII. Section 1623 of Title 18 of the United States Code makes it a crime to knowingly make a false material declaration under oath. 18 U.S.C. § 1623(a). However, both the United States Supreme Court and the Tenth Circuit have declined to construe perjury statutes broadly. *See, e.g.*, *United States v. Farmer*, 137 F.3d 1265, 1267-68 (10th Cir. 1998) ("Precise questioning is imperative as a predicate for the offense of perjury." (quoting *Bronston v. United States*, 409 U.S. 352, 362 (1973))). Accordingly, "[t]he burden is on the questioner to pin the witness down to the specific object to the questioner's inquiry. *Bronston*, 409 U.S. at 360.

### 1. Strohm's Testimony Regarding Her "Involvement" in the PAS Sale

Strohm first argues that her questioner's first question as to whether she was "involved" in the PAS sale was fundamentally ambiguous and therefore cannot serve as a basis for a perjury conviction. The Tenth Circuit defines a question as fundamentally ambiguous "when it 'is not a phrase with a meaning about which men of ordinary intellect could agree, nor one which could be used with mutual understanding by a questioner and answerer unless it were defined at the

time it were sought and offered as testimony.'" *Farmer*, 137 F.3d at 1269 (quoting *United States v. Dietz*, No. 93-8073, 1994 WL 319259, at *4 (10th Cir. 1994)). The *Farmer* court cautioned, however, that "in most instances, the meaning of a prosecutor's question and the truthfulness of a defendant's answer are best left to the jury." *Id.* ("Fundamental ambiguity is the exception, not the rule."). As a result, "[a] defendant may not succeed on a claim of fundamental ambiguity by isolating a question from its context in an attempt to give it a meaning entirely different from that which it has when considered in light of the testimony as a whole." *Id.*

In *Farmer*, the defendant was asked during a pretrial hearing by counsel for the United States, "Have you talked to Mr. McMahon, the Defendant about your testimony here today?" *Id.* at 1270. Though the court stopped short of labeling the question fundamentally ambiguous, it held that the question at issue certainly "seem[ed]" fundamentally ambiguous because, when viewed in isolation, it was "patently unclear" what part of the sentence the phrase "here today" modified. *Id.*

In the present case, the question "Were you involved in that sale?" presents no such fundamental ambiguity. Simply put, the structure of the question posed to Strohm, unlike the one at issue in *Farmer*, was clear. Furthermore, when placed in the context of the SEC case in which Strohm was testifying, it becomes even more clear that any confusion regarding the scope of the word "involved," as used by Strohm's own attorney, did not present the type of exceptional ambiguity that would allow this Court to hold that the question was fundamentally ambiguous and therefore not amenable to jury interpretation.

Strohm next argues that the question, "Where you involved in that sale?," if not "fundamentally ambiguous," was nevertheless "arguably ambiguous." In the Tenth Circuit, when

a question is only "arguably" ambiguous "courts reviewing perjury convictions have viewed the defense of ambiguity as an attack upon the sufficiency of the evidence." *Farmer*, 137 F.3d at 1269. Accordingly, the Court must determine whether the evidence, when viewed in the light most favorable to the Government, is sufficient that a "reasonable jury could have found all elements of the crime beyond a reasonable doubt." *Id.* In cases "[w]here a question admits of two reasonable interpretations, some evidence must show what the question meant to the defendant when she answered it." *Id.*; *see also United States v. Glantz*, 847 F.2d 1, 6 (1st Cir. 1988) ("The principles underlying the *Bronston* decision also bar perjury convictions for arguably untrue answers to vague or ambiguous questions when there is insufficient evidence of how they were understood by the witness."). Of course, not every conceivable ambiguity must be ruled out by the government, as the questioner's and the declarant's words used are to be understood in context and given their common and ordinary meaning. *See, e.g.*, *United States v. Bonacorsa*, 528 F.2d 1218, 1221 (2d Cir. 1976) ("A defense to a charge of perjury may not be established by isolating a statement from context, giving it in this manner a meaning entirely different from that which it has when the testimony is considered as a whole); *United States v. Daniels*, 174 F. Supp. 2d 1209, 1213 (D. Kan. 2001) (holding that the common and ordinary meaning of the phrase "loss of taste" was sufficient to establish the defendant's understanding of it); *United State v. Serafinia*, 7 F. Supp. 2d 529, 539 (M.D. Pa. 1998) ("Although a prosecutor must be careful to establish a clear meaning as to the critical terms that form the basis of a perjury charge, some words are so common that there cannot be any ambiguity.").

Strohm argues that the term "involved" is susceptible to several reasonable interpretations. *See* Strohm's Memorandum in Support of Acquittal, at 7-8, dkt 111 ("Did it

mean directly soliciting the sale? Acting as a member of the salesforce? Knowing about the sale? Accounting for the sale?"). She then points out that no evidence was presented by the government that she participated in soliciting the PAS sale. *Id.* at 9, 10. The government, however, does not have to prove that Strohm's answer was false under every conceivable interpretation of the question. Rather, the government must only produce evidence to show how the question was in fact interpreted by the defendant, and that the defendant's response was false in light of that interpretation. In the present case, the evidence was sufficient to support the government's contention that Strohm was denying any "involvement" in the PAS transaction in the broadest sense. Neither the context of the SEC's allegations nor the questions of Strohm's attorney suggest any idiosyncratic meaning to the word "involved." Rather, Strohm's statement that she was not "involved" in the transaction and that she could not remember when she became aware of the sale of product to PAS is best understood as a broad, general denial of any involvement in the shipment of product to PAS on the last days of ClearOne's fiscal year in 2002.

Placed in this context, it becomes clear that the evidence, when viewed in the light most favorable to the government, sufficed to allow the jury to reasonably conclude that Strohm was "involved" in the PAS sale and that she was knowingly stating a falsehood when she testified otherwise. Strohm was copied on an email in which Flood explained that ClearOne was desperate to ship V-Theres in order to make its revenue projections. *See* Exhibit 1. Strohm was present at the offices of ClearOne on June 29, 2002, when the PAS order was filled by Nick McGill and Suzy Bailey. *See* Testimony of Misty Chalk, Tim Morrison, and Nick McGill. Strohm was working at Morrison's computer on that same Saturday, where she was running the

numbers, and increased the price on the V-There units shipped to PAS to make up for shortfalls caused by other lower margin sales. *See* Testimony of Tim Morrison. This price change was done entirely to create the appearance of revenue and without the knowledge of anyone at PAS. *See* Exhibit 267.

Strohm's additional arguments–regarding the materiality of the statement, Strohm's willfulness in making the statement, the characterization of the transaction as a sale, and the alleged inconsistency of the jury's verdict–all lack merit. First, the evidence introduced at trial established that the PAS transaction was material to the issue of revenue recognition, which was the subject of the SEC lawsuit, as well as the criminal trial. Tracy Christman testified at length about the importance of the timing of a transaction and the jury was certainly entitled to consider this testimony in determining the materiality of Strohm's statement.

Second, there was sufficient evidence from which the jury could reasonably conclude that Strohm willfully misstated her lack of involvement in the PAS transaction. At trial, the government introduced substantial evidence of Strohm's willful participation in misleading auditors, the SEC, the public, and the Court. Strohm signed representation letters to Ernst & Young that falsely characterized as "sales" the shipments on June 29th and 30th, which included the PAS shipment. There was testimony that Strohm herself increased the price of the V-Theres on the PAS shipment to $5,000 for the sole purpose of meeting ClearOne's revenue projections. Strohm told Brian Woodland that the only reason for the PAS shipment was because Mike Peirce did not order the V-Theres that were critical for ClearOne to make its numbers. Strohm told Woodland that she did not want to have to deal with the auditors with regard to the PAS transaction and refused to book a return for the product from PAS because she did not want to

restate ClearOne's numbers.

Third, the fact that the government's position at trial was that the PAS transaction was not a legal "sale" does not alter the analysis in any way. Indeed, as the government points out, the fact the Strohm's lawyer chose to characterize the transaction as a "sale" rather than a "sham" during the preliminary injunction hearing is neither surprising nor exonerating. Memorandum in Opposition, at 15, dkt. 113. Indeed, the defense has always claimed the transaction was a sale.

Finally, Strohm's argument that the Jury's acquittal of her on Count VI is inconsistent with its conviction of her on Count VIII, both of which dealt with the PAS transaction, is without merit. An inconsistent verdict does not serve as the basis for a judgment of acquittal. *See United States v. Powell*, 469 U.S. 57, 69 (1984) ("[T]here is no reason to vacate respondent's conviction merely because the verdicts cannot rationally be reconciled. Respondent is given the benefit of her acquittal on the counts on which she was acquitted, and it is neither irrational nor illogical to require her to accept the burden of conviction on the counts on which the jury convicted."). Furthermore, the two verdicts are not clearly inconsistent. The jury could have determined there was insufficient proof of Strohm's involvement in the scheme to commit securities fraud by misrepresenting the nature of this transaction to the auditors and others while at the same time believing she knowingly lied about not having been involved in it at all, or, even more plausibly, that she lied about when she learned about it. There is clearly a difference between knowingly involving oneself in securities fraud, and knowingly falsely denying having even known about the transaction before the end of the fiscal year. There was abundant evidence that Strohm at least knew about the PAS "sale" before the end of the fiscal year (June 30, 2002), while arguably

considerably less evidence as to her knowing participation in the securities fraud activities
associated with the transaction.

**2. Strohm's Testimony Regarding When She Learned about the PAS Shipment**

Strohm contends that her testimony regarding when she learned about the PAS
transaction was not perjurious because her statement was truthful, not willfully false, and not
material; and because the PAS transaction was not a sale. None of these arguments have merit.
First, as stated above, the government introduced evidence sufficient for the jury to conclude that
Strohm's statement was not truthful because she knew that this shipment took place on June 29,
2002, before the end of the 2002 fiscal year. In addition, the evidence presented at trial was
sufficient for the jury to conclude that Strohm was willfully testifying falsely when she stated
that she did not know if the PAS transaction came to her attention before the end of the fiscal
year. Brian Woodland testified that he met with Strohm in late 2002 regarding the return of
products from PAS, and that Strohm told him that ClearOne had shipped the products to PAS
because Mike Peirce failed to order any V-Theres. *See* Transcript Vol X, at 121-23. At a
subsequent meeting, Strohm told Woodland that she did not want to have to deal with the
auditors' scrutiny of the PAS transaction. *Id.* at 125. This second meeting took place in late
December, 2002, approximately sixty-five days before Strohm made the statements at issue in
Count VIII. Tim Morrison also testified that Strohm instigated the change in price of the V-
There units shipped to PAS during a meeting in his office on June 29, 2002 in order to meet
ClearOne's year-end revenue goals. The evidence therefore established that Strohm knew the
history of the transaction, knew that the timing of the transaction was important to recognizing
revenue on the shipment, was personally involved in creating the PAS shipment prior to the end

of the 2002 fiscal year, and recalled all of this as late as the end of December, 2002. As a result,

a reasonable jury could certainly have inferred that on March 3, 2003, Strohm knew that she had

learned of the PAS transaction before the end of the 2002 fiscal year and that her testimony to

the contrary was therefore false. Second, as noted above, the timing of the PAS transaction was

material to the issue of revenue recognition, which was the subject of the SEC lawsuit. Hiding

the timing of her knowledge of the PAS shipment reduced the possibility that Strohm would be

held personally responsible for the securities fraud that the SEC alleged had occurred at

ClearOne. Accordingly, the question was material to SEC action. Finally, and again as noted

above, the fact that Strohm's attorney referred to the products involved in the PAS transaction as

having been "sold," as opposed to characterizing them as a part of a "sham" does not alter the

analysis in any way.

For the foregoing reasons, Strohm's motion for acquittal pursuant to Rule 29 is DENIED.

First, Count VIII of the indictment is not improperly charged because the two statements charged

are part of the same continuing scheme. Furthermore, Strohm waived her objection to the

duplicitous nature of the count by not presenting her objection to the Court in a timely fashion

and any danger of jury non-unanimity was cured by the Court's instructions to the jury. Finally,

her motion as to sufficiency of the evidence fails because, when viewed in the light most

favorable to the government, the evidence presented at trial was sufficient for a reasonable jury

to find that Strohm testified falsely when she (1) denied involvement in the PAS transaction and

(2) stated that she did not know when she learned of that transaction.

### IV. Frances M. Flood

The Court will next address whether the government presented sufficient evidence, under

the Rule 29 standard, to support the jury's conviction of Flood on all counts of the indictment. Flood's motion rests solely upon her oral arguments at the close of the government's case on February 20, 2009 and at the hearing covering this motion on May 15, 2009. No written memorandum was submitted. In regards to Counts I through VI charging Flood with conspiracy, false statements to auditors, and securities fraud respectively, Flood argues that the evidence was insufficient to demonstrate that she had knowledge of the alleged "pay-as-you-go" terms between ClearOne and the distributors.

The Court however finds that the evidence presented by the government was sufficient to establish each element of the crimes charged in Counts I through VI. The evidence established that Flood approved payment term arrangements with ClearOne's distributors that were different from the written terms of their distributorship agreements for the purpose of fraudulently enhancing ClearOne's revenue. Furthermore, the evidence also showed that the existence of these side deals was not communicated to ClearOne's auditors and was in fact intentionally concealed from them, all with Flood's knowledge and participation.

Flood also argued on both occasions that the three perjury charges were based on ambiguous questions and answers and therefore not amenable to jury interpretation. Count IX charged Flood with testifying falsely when she denied knowledge of the side agreements with the distributors which provided for terms that differed from those contained in the written distributorship agreements. Count X charged Flood with testifying falsely regarding the extent of her involvement with the MCSi transaction. Finally, Count XI charged Flood with testifying falsely when she denied that ClearOne switched to a distributor model in order to recognize more revenue. Simply put, the Court finds that the underlying questions and answers were not

"fundamentally ambiguous" as that phrase is interpreted by the Tenth Circuit and that the government introduced sufficient evidence for a rational trier of fact to find that Flood committed each of the counts of perjury charged in the Indictment.

### IV. Conclusion

For the foregoing reasons, the Court finds that the evidence presented was sufficient for the jury to find that Defendant Strohm committed perjury as alleged in Count VIII of the indictment when she testified both that she was not involved in the PAS sale and that she did not know whether that sale came to her attention before the end of ClearOne's fiscal year. In addition, the Court finds that sufficient evidence was presented as to each of the nine counts against Defendant Flood to support the jury's verdict. Accordingly, both Defendants' Rule 29 motions are DENIED.

**IT IS SO ORDERED.**

DATED this 16th of June, 2009.

BY THE COURT:

Judge Dee Benson
United States District Court